### IN THE UNITED STATES DISTRICT COURT FOR THE
### EASTERN DISTRICT OF VIRGINIA

**Alexandria Division**

| | | |
|---|---|---|
| John Morgan Hosay, | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | **1:20cv690 (CMH/JFA)** |
| | ) | |
| Alison Land, et al., | ) | |
| Respondent. | ) | |

### MEMORANDUM OPINION

John Morgan Hosay ("Hosay" or "petitioner"), a civil detainee proceeding pro se, has filed a petition for a writ of habeas corpus, pursuant to 28 U.S.C. § 2254, alleging he is being detained at the Central State Hospital ("CSH") in violation of his constitutional rights pursuant to an order of the Circuit Court of Goochland County entered on April 23, 2019. Respondent has filed a Motion to Dismiss, with a supporting brief, and Hosay has been afforded the opportunity to file responsive materials pursuant to Roseboro v. Garrison, 528 F.2d 309 (4th Cir. 1975). Accordingly, this matter is now ripe for disposition. For the reasons that follow, respondent's Motion to Dismiss shall be granted, and the petition will be dismissed.

### Procedural History

Hosay was indicted for the attempted first-degree murder of his wife on June 17, 2018 by a grand jury sitting in the Circuit Court of Goochland County. Commonwealth v. Hosay, Case No. CR18-71. On July 24, 2018, the circuit court considered a proffer by the prosecutor and reviewed a May 31, 2018 report by Dr. Evan S. Nelson ("Dr. Nelson's Report") that addressed Hosay's competency to stand trial and his sanity at the time of the offense. Based upon the report and proffer, the circuit court found Hosay not guilty by reason of insanity ("NGRI") of the attempted first-degree murder of his wife and committed Hosay to the temporary custody of the

Commissioner of the Virginia Department of Behavioral Health and Developmental Services ("VDBHDS") for evaluation.

On April 19, 2019, the circuit court conducted a hearing to determine if Hosay could be released on conditions or needed to be committed for inpatient hospitalization. At the end of the hearing, the circuit court found by clear and convincing evidence that Hosay has "bipolar disorder with ... psychotic features" and "that if released at this time there's a likelihood that he will engage in conduct which presents a substantial risk of bodily harm to himself or others." (Tr. at 135). The trial judge noted that the inpatient treatment program had a graduated transition component that would allow the professionals handling his care to assess how Hosay would handle the stress of additional liberty as his treatment progressed and that given Hosay's "disagreement with his diagnosis and proposed treatment that he [could]not be adequately controlled with supervision and treatment on an outpatient basis." (Id.). The order committing Hosay to the custody of the Commissioner of VDBHDS was entered on April 23, 2019, and the same order set Hosay's review hearing on April 17, 2020.[1] Hosay noted his appeal. On January 27, 2020, the Supreme Court of Virginia refused his petition for appeal from the commitment order noting that there was "no reversible error in the judgment complained of." (Hosay v. Commonwealth, Record No. 190966, R. at 58) (hereinafter "App. R. at __").

**Background**

*A. Trial Court Proceedings*

The July 24, 2018 proffer established that Hosay, without provocation, attacked his wife on March 23, 2018 in their Goochland County, Virginia home. He stabbed her twice in the chest and once in the head. Hosay left the house and his wife locked the doors and called 911. The

---

[1] The review hearing was continued and is now set for November 10, 2020. [Dkt. No. 11 at 2].

2

police arrived and found Hosay in the front yard and read him his <u>Miranda</u> rights.  After being told his wife was alive, Hosay responded that he did not like her and that it was "too bad" because "he was trying to kill her."  (Tr. at 15).  Hosay identified the knife he had used and then told the police that he was "Jesus" and that even though he had "tried to kill his wife, he could bring her back to life."  (<u>Id.</u>).  After his arrest, Hosay told another officer that he and his wife had not been fighting and that "bad memories in his head had caused the incident."  (<u>Id.</u>).

During booking, Hosay made facial expressions in which "he showed his teeth" and at one point "growled," stated that he "was Voldemort, then growled again and looked around." (<u>Id.</u> at 16).  Hosay, however, never acted in an aggressive manner with the officers and was compliant.  After his arrest, Hosay was detained in jail.

A temporary detention order ("TDO") was issued on March 28, 2018 committing Hosay to Central State Hospital ("CSH").  Hosay was released on April 13, 2018 and returned to jail. (Tr. at 78).  On April 26, 2018, the Goochland Juvenile and Domestic Relations District Court issued an order directing Dr. Nelson to perform a competency and sanity at the time of the offense evaluation.  Dr. Nelson's Report found Hosay was competent to stand trial and noted that he had a history of "Bipolar Disorder with Psychosis, or its diagnostic cousin ... Schizoaffective Disorder."  (Dr. Nelson's Report at 2, 6).  A second TDO was issued on April 28, 2018 and Hosay was recommitted to CSH.  He was returned to the jail on April 30, 2018.  (Tr. at 78).

Dr. Nelson's Report indicated that Hosay's first episode of depression occurred when he was 25 and that was the first time he had "heard a voice and experienced psychosis."  (Dr. Nelson's Report at 5).[2]  The voice told him to kill his father.  When Hosay did not, the voice told him he would "pay," and Hosay smashed windows at his home later that day and thereafter he

---

[2] Hosay was born October 29, 1963 and was 54 when Dr. Nelson examined him.  (<u>Id.</u> at 3).

heard the voice and felt "power." (Id.). The voice has "plagued" Hosay over the years and he told Dr. Nelson that his next episode was about ten years later and that he also had been hospitalized about ten times. (Id. at 4). Hosay refused to take conventional medications and believed that sleep deprivation in mid-February 2018 had "set off" the recent episode that led to his attack on his wife.

Hosay told Dr. Nelson that the voice he had heard when he was 25 told him to stab his wife on March 23, 2018. Hosay told Dr Nelson he had never had thoughts of hurting his wife prior to stabbing her. After he stabbed her, Hosay fled the room. His wife told him later that Hosay had said to her "It's a demon," but Hosay did not refer to the voice as the devil but did state that "the voice was some kind of evil." (Id. at 10). Dr. Nelson summarized his examination by noting that Hosay left his bedroom that morning, "fetched a knife from his kitchen" attacked his wife in bed, and that there was no "rational provocation at that moment" or "just prior to" the attack. (Id. at 11).

A hearing was held on April 19, 2019 to determine whether Hosay should be committed for inpatient hospitalization, conditionally released, or released without conditions. The Commonwealth relied upon the reports by three doctors that had examined Hosay: Dr. Will's analysis of risk report ("Dr. Will's Report"); Dr. Guthrie's temporary custody evaluation report ("Dr. Guthrie's Report"); and Dr. Singer's temporary custody evaluation report ("Dr. Singer's Report") (Tr. at 46-47).

Dr. Guthrie examined Hosay on August 28, 2018 and recommended that "Hosay be committed for inpatient psychiatric hospitalization." (Dr. Guthrie Report at 11). Dr. Guthrie's Report found Hosay suffered from bipolar disorder and that while he "did not present with any acute signs or symptoms of unstable mood or psychosis," Hosay had a "history of cyclical

4

episodes of mood disturbance and associated psychosis, which have included command auditory hallucinations to kill family members." (Id.).  Regarding risk of harm if released, Dr. Guthrie testified that he was not aware of any active psychotic episodes since he had seen Hosay in August 2018, and that his last active psychotic episode was around April 28, 2018 when he was in the jail.  Dr. Guthrie also testified that he was aware that Hosay had not complied with the recommendations of his treatment team.  (Tr. at 54-56).  Dr. Guthrie's opinion was that Hosay "is mentally ill and requires in patient hospitalization."  (Id. at 69).  Dr. Guthrie explained that the medication Hosay had refused, Lamictal (generic Lamotrigine[3]), prevents "major mood episodes for individuals with bipolar disorder, so that would be a very significant and reasonable risk mitigation strategy if" Hosay agreed to take the medication.  (Id. at 70).  Even if Hosay agreed to take Lamitcal, however, Dr. Guthrie would not recommend his release.

Hosay's next witness, Dr. Gardella, was his treating psychiatrist at CSH during the second TDO and for a short time following Hosay's commitment to CSH.  Dr. Gardella testified that when Hosay was released from CSH after the second TDO to return to the jail, Hosay "was continuing to clear from his previous episode, and despite some residual symptoms at that time they were not sufficient to warrant involuntary hospitalization.  (Id. at 79).  Hosay was still recovering when he was returned to the jail on April 30, 2018 but the status of his illness was such that he did not require "emergency hospitalization" and Hosay did not "clear" from that episode until sometime in May.  (Id. at 82, 83).

When Hosay returned to CSH in July 2018, Hosay "clearly had psychotic symptoms" in April but the most recent update Dr. Gardella had from CSH was that Hosay was "clinically stable without current evidence of psychosis or mania," and that he had not had "any instances of

---

[3] See https://www.drugs.com/lamictal.html (last viewed September 17, 2020).

psychosis or manic behavior" since his admission on July 30, 2018.  (Id. at 82).  Dr. Gardella diagnosed Hosay as bipolar with psychotic features and stated that "the natural history of that disorder is a recurrence."  (Id.).  Dr. Gardella opined that when Hosay is "not in an active state of mania he is a very calm, nonviolent person."  (Id. at 84).

Regarding Hosay's refusal to take recommended medications, Dr. Gardella testified that Hosay had refused to take the Lamotrigine and had avoided "all of the other first line treatment" to prevent the "next episode of mania or mixed states."  (Id. at 86).  Dr. Gardella noted that Hosay had refused "the recommended treatment at that time except for the natural supplement" and described Lamotrigine as "an insurance policy against the next episode."  (Id. at 79, 86). While Hosay could remain stable without medication, Dr. Gardella testified that you cannot predict individuals with bipolar disorder because of a multitude of external stressors and because there can be spontaneous episodes.  (Id. at 88).  Dr. Gardella opined that while some individuals do not need medication for conditional release,"[t]hat is not the case for Mr. Hosay."  (Id. at 95). Dr. Gardella testified that overtime patients with bipolar disorder tend to move toward having one episode per year, but because of the multitude of internal and external stressors, he could not "make a prediction."  (Id. at 88).  Dr. Gardella concluded his testimony by opining that if Hosay was committed he would begin a process of transition back to the community "that typically takes months to years," depending on the individuals continued demonstration of clinical stability.  (Id. at 96).

Dr. Singer did not testify but his report was submitted without objection.  Dr. Singer opined that Hosay had a mental illness (bipolar disorder with psychotic features) and that he required inpatient hospitalization.  Dr. Singer further opined that if Hosay was not hospitalized, there would be a significant risk of bodily harm to other persons and/or himself in the

foreseeable future" and that Hosay could not be "adequately controlled with supervision and treatment on an outpatient basis at this time." (Dr. Singer's Report at 14, 15).

Hosay's position at the hearing was that if he was not displaying active psychosis on the day of the hearing, even though he still suffered from the mental illness, the court needed to release him. (Id. at 93). Hosay argued that because he had not had a psychotic episode in over a year he should be released because he was not "dangerous as he sits in this chair today." (Id. at 131). The trial judge rejected the argument that commitment was only appropriate if Hosay was "currently experiencing active psychotic episodes." (Id. at 133 ). The trial judge found by clear and convincing evidence that Hosay has "bipolar disorder with ... psychotic features" and "that if released at this time there's a likelihood that he will engage in conduct which presents a substantial risk of bodily harm to himself or others." (Tr. at 135). The trial judge noted that the inpatient treatment program did have a graduated transition component that would allow the professionals handling his care to assess how Hosay would handle the stress of additional liberty as his treatment progressed. The trial judge further found that given Hosay's "disagreement with his diagnosis and proposed treatment that he [could]not be adequately controlled with supervision and treatment on an outpatient basis." (Id.). At the conclusion of the hearing, the circuit court denied petitioner's motion for conditional release, and ordered that petitioner be committed to the custody of the Commissioner of VDBHDS.

*B. Post-conviction Proceedings*

Hosay filed a petition for appeal in the Supreme Court of Virginia and alleged three assignments of error:

1. The Circuit Court erred by misinterpreting the constitutional due process standard imposed by the United States Supreme Court in Foucha v. Louisiana, 504 U.S. 71 (1992) by disregarding the legal equivalency between the civil commitment standard under Code of Virginia § 37.2-817 and the standard for

7

continued commitment under Code of Virginia § 19.2-182.3 for an individual found not guilty by reason of insanity.

2. The Circuit Court erred by misinterpreting the legal standard for civil commitment under Code of Virginia § 37.2- 817 to allow the Commonwealth to assign different levels of dangerousness to an individual depending upon the alternatives for that individual's release. Further, Petitioner alleged that the circuit court affirmatively prevented the further presentation of evidence and argument on this matter by counsel, meeting both the good cause and ends of justice exceptions in Rule 5:25 of the Rules of the Supreme Court.

3. The Circuit Court erred in finding that Mr. Hosay remains both mentally ill and dangerous because the evidence demonstrated that he was not dangerous as of April 30, 2018, that he remained asymptomatic continuously until the April 19, 2019 hearing, and that he was not dangerous while he remained clinically stable without evidence of psychosis or mania. Consequently, the Circuit Court lacked sufficient evidence to reach the conclusion that Mr. Hosay remains both mentally ill and dangerous under a clear and convincing evidentiary standard.

(App R. at 25-26)  The Supreme Court of Virginia refused the petition for appeal on

January 27, 2020.  (App. R. at 58).

On June 9, 2020, Hosay filed a § 2254 habeas petition in this Court challenging

the validity of the April 23, 2019 commitment order,[4] and raises four claims:

1. The circuit court used "differing standards for NGRI commitment and civil commitment as prohibited by federal law." [Dkt: No. 1 at 5].

2. "The dangerousness standards for civil commitment were held to be dependent upon possible release options, as opposed to whether the individual had regained sanity." (Tr. at 93-94).  [Id. at 7].

3. The circuit court "prevented further presentation of evidence and argument in relation to Ground #2." (Tr. at 89-94).  [Id. at 8].

4. At the time of his commitment hearing, Hosay had regained his sanity and had been stable for an entire year. By April 30th, 2018, Hosay had regained his sanity and did not meet the standard for civil commitment during a temporary Detention Order (TDO) hearing.  That was still true at the time of his NGRI ("civil") commitment hearing on April 19, 2019." [Id. at 10].

---

[4]  The Supreme Court has recognized that federal habeas corpus review may be available to challenge a state court order of civil commitment. See Duncan v. Walker, 533 U.S. 167, 176, (2001); Von Flowers v. Leean, 215 F.3d 1331 (7th Cir. 2000) (table case) (a person confined in a mental institution is in custody for purposes of § 2254).

### III. Exhaustion and Standard of Review

"[A] federal court may not grant a writ of habeas corpus to a petitioner in state custody unless the petitioner has first exhausted his state remedies by presenting his claims to the highest state court." <u>Baker v. Corcoran</u>, 220 F.3d 276, 288 (4th Cir. 2000).  To satisfy the exhaustion requirement, a petitioner "must have presented to the state court 'both the operative facts and the controlling legal principles.'" <u>Kasi v. Angelone</u>, 300 F.3d 487, 501-02 (4th Cir. 2002) (citation omitted). process."  In the instant case, Respondent admits Hosay has exhausted his claims. [Dkt. No. 15 at 5].

A. *AEDPA*

The Anti-terrorism and Effective Death Penalty Act of 1996 (AEDPA) abolishes *de novo* review in federal habeas cases and requires deference to a state court's decision on the merits unless that decision was (1) contrary to, or an unreasonable application of a clearly established Supreme Court decision, or (2) based on an unreasonable determination of facts.  <u>See</u> 28 U.S.C. § 2254(d); <u>Williams v. Taylor</u>, 529 U.S. 362, 403-13 (2000).  Under 28 U.S.C. § 2254(e)(1), a federal court must presume a state court's determination of facts is correct unless rebutted by clear and convincing evidence.  <u>Sharpe v. Bell</u>, 593 F.3d 372, 378 (4th Cir. 2010) (factual issue determined by state court "shall be presumed to be correct"); <u>see also</u> <u>Sumner v. Mata</u>, 455 U.S. 591, 591-93 (1983) (per curiam) (statutory presumption of correctness applies to state appellate court's rendition of historical facts).

Under the "unreasonable application" clause, the writ should be granted if the federal court finds that the state court "identifies the correct governing legal principle from [the Supreme] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." <u>Id.</u>  The standard of reasonableness is an objective one. <u>Id.</u> at 410.  The focus of a federal court under this standard "is now on the state court decision that previously addressed the claims

9

rather than the petitioner's free-standing claims themselves." <u>McLee v. Angelone</u>, 967 F. Supp. 152, 156 (E.D. Va. 1997). The Fourth Circuit recently stated that the

> deference under § 2254 ensures "state proceedings are the central process, not just a preliminary step for a later federal habeas proceeding." <u>Harrington v. Richter</u>, 562 U.S. 86, 103, (2011). Accordingly, we may grant habeas relief on claims adjudicated on their merits in state court only if the adjudication "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d); <u>see also</u> <u>Cummings v. Polk</u>, 475 F.3d 230, 237 (4th Cir. 2007).

<u>Sigmon v. Stirling</u>, 956 F.3d 183, 191 (4th Cir. 2020).

The Virginia Supreme Court issued a short-form order refusing the appeal. Thus, this Court will look to the decision of the trial court for the state court ruling. <u>Ylst v. Nunnamaker</u>, 501 U.S. 797, 805-06 (1991); <u>Bennett v. Angelone</u>, 92 F.3d 1336, 1343 (4th Cir. 1996).

*B. Claim 1*

In claim 1, Hosay asserts that the trial court "utilized and accepted differing standards for NGRI commitment and civil commitment as prohibited by federal law," and that he "did not meet the standards for civil commitment." The record establishes the trial judge complied with and applied the standard established in <u>Foucha</u> when he committed Hosay to CSH.[5]

On July 24, 2018, Hosay was found NGRI and committed to the custody of the Commissioner of the VDBHDS and the circuit court set a hearing to determine if Hosay "would be released with or without conditions or require[d] commitment." At the hearing, Hosay's

---

[5] The Supreme Court of Virginia's jurisprudence has discussed <u>Foucha</u> and <u>Jones v. United States</u>, 463 U.S. 354, (1983) and acknowledged that <u>Foucha</u> "affirmed the principle that a state cannot confine an individual with a mental illness absent a showing by clear and convincing evidence 'that the individual is mentally ill and dangerous.'" <u>Mercer v. Commonwealth</u>, 523 S.E.2d 213, 215 (Va. 2000) (citing <u>Foucha</u>, 504 U.S. at 80 (quoting <u>Jones</u>, 463 U.S. at 362)).

counsel argued that because Hosay was returned to the jail from the TDO on April 30, 2018, a magistrate had determined that Hosay was no longer dangerous.[6] Hosay's counsel argued that the standard for release was the same under the civil commitment statute and the NGRI statute and that there was no evidence of dangerousness for the year prior to the April 19, 2020 hearing. Consequently, the court was required to release Hosay. (Tr. at 91-93). Hosay's counsel argued that because Hosay was not displaying psychotic features at the hearing on April 19, 2019, there was no basis to find that Hosay was dangerous and the court had to release him. (Id. at 93).

The record in this case is clear that the trial judge applied the Foucha standard when he committed Hosay to the custody of the Commissioner of the VDBHDS. At the conclusion of the hearing, the trial judge found by clear and convincing evidence that Hosay had "bipolar disorder with … psychotic features" and "that if released at this time there's a likelihood that he will engage in conduct which presents a substantial risk of bodily harm to himself or others." (Tr. at 135). In terms of federal law, the trial judge applied the correct standard to determine if Hosay should be released or remain committed.[7]

Foucha held that an "acquittee may be held as long as he is both mentally ill and dangerous, but no longer." 504 U.S. at 77.

> Thus, an application for release of an insanity acquittee has two components: (a) a present mental illness and (b) dangerousness stemming from that illness. Id.; see United States v. Bilyk, 29 F.3d 459, 462 & n.3 (8th Cir. 1994) (per curiam) (recognizing that future dangerousness alone is not a proper basis for the continued confinement of an insanity acquittee) (citing Foucha, 504 U.S. at 77-79); see also United States v. Wattleton, 296 F.3d 1184, 1202 n.35 (11th Cir.

---

[6] Hosay's use of the April 30, 2018 date was not supported by the testimony. Dr. Gardella testified that Hosay was still suffering from his latest episode when he was returned to the jail on April 30, 2018 and that he did not "clear" until sometime in May. (Id. at 82). .

[7] To the extent Hosay argues that the trial judge erred in applying state statutes, such an alleged error is not cognizable in federal habeas. Estelle v. McGuire, 502 U.S. 62, 67-68 (1991) ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").

2002) ("[T]he holding of Foucha provides that a defendant's dangerous propensities alone may not serve as a continued basis for confinement following an insanity verdict ...."); Parrish v. Colorado, 78 F.3d 1473, 1477 (10th Cir. 1996) ("[T]he real significance of the [Foucha] holding is that unless an acquittee has an identifiable mental condition, he cannot be held by the state merely because he is dangerous.").

Revels v. Sanders, 519 F.3d 734, 740-741 (8th Cir. 2008).

The record supports the trial judge's finding that Hosay suffers from a mental illness, bipolar disorder with psychotic features—all of the experts agreed on this point at the hearing. The state court's determination to commit Hosay was not based upon an unreasonable determination of facts, Sigmon, 956 F.3d at 191, and the fact that Hosay was asymptomatic on the day of the hearing does not render the circuit court's finding unreasonable.

> [S]ymptoms and mental illness are not one in the same. See United States v. Murdoch, 98 F.3d 472, 476 (9th Cir. 1996) ("[Appellant's] argument erroneously focuses on the symptoms or side-effects of his mental disease rather than on the existence of the disease itself."). The fact that [petitioner] may be asymptomatic does not preclude a finding of mental illness. See id.; United States v. Weed, 389 F.3d 1060, 1073 (10th Cir. 2004) (upholding district court's finding that petitioner had mental illness even though he "no longer shows symptoms of psychosis and meets no DSM-IV criteria for mental illness [because] the testifying doctors agree that [the petitioner] may still suffer from a condition not triggered since the time of the crime").

Grass v. Reitz, 749 F.3d 738, 743 (8th Cir. 2014).

In addition, the circuit court did not violate clearly established federal law when it found that if Hosay were released that there was a likelihood that Hosay would engage in conduct that presented a substantial risk of bodily harm to himself or others. The temporal concept that Hosay's argument presents was addressed in the habeas context by the Fifth Circuit, which held that a state court had not violated clearly established federal law when it found that the petitioner had the "*potential* for both danger to himself and to others and that the expert testimony about the [petitioner's] current remission 'does not negate the potential that [the petitioner] ... would

not manifest or relapse into the delusions and/or behavior that presented itself through the years.'" Poree v. Collins, 866 F.3d 235, 250 (5th Cir. 2017) (emphasis added).

Poree held that the Supreme Court had not explicitly addressed how a state may make its dangerousness determination," but that the Court in Jones had "indicated that the dangerousness finding is *predictive* in nature and that the government is permitted to protect against the 'potential dangerousness' of NGBRI aqcuittees." Poree, 866 F.3d at 248 (citing 463 U.S. at 368) (emphasis added). Poree stated that the Supreme Court, however, had only "clearly established that a finding of dangerousness is one of two prerequisites to continued civil confinement." Id.

> Together, Jones and Foucha establish that the state must prove two conditions to justify continued confinement of an NGBRI acquittee: mental illness and dangerousness. As [petitioner] concedes, however, the Supreme Court has never precisely defined the contours of the dangerousness inquiry, and language in Jones suggests that the "dangerousness" finding is inherently *predictive*. Thus, even if [petitioner] is correct that dangerousness must have some temporal limitation to retain meaning, the Supreme Court has not provided any yardstick for determining *what probability of danger* is sufficient and what falls short. Particularly in light of Jones's acknowledgement that one of the purposes of confining NGBRI acquittees is to protect society from "*potential*" dangerousness, it is not clearly established that a court's finding of "*potential*" dangerousness, coupled with a finding of mental illness, is insufficient to justify continued confinement.

Poree, 866 F.3d at 249 (emphasis added).

Jones concluded that "[t]he fact that a person has been found, beyond a reasonable doubt, to have committed a criminal act certainly indicates dangerousness. 463 U.S. at 364 (citing Lynch v. Overholser, 369 U.S. 705, 714 (1962) (fact that the accused was found to have committed a criminal act is "strong evidence that his continued liberty could imperil 'the preservation of public peace'")). Jones also found that such "concrete evidence generally may be at least as persuasive as any predictions about dangerousness that might be made in a civil-commitment proceeding." Id. In the analogous context of the civil commitment of sexual predators, the Supreme Court reiterated that it had "recognized, '*previous instances of violent*

13

*behavior are an important indicator of future violent tendencies.*'"   <u>Kansas v. Hendricks</u>, 521 U.S. 346, 358 (1997) (citations omitted) (emphasis added).

Here, the reports before the circuit court established that Hosay was admitted to at least 10 psychiatric hospitals over the 20 years that preceded his attack on his wife.  (Dr. Singer's Report at 17).  Dr. Singer noted that while Hosay was free of psychotic symptomology when he observed him in August 2018, Hosay was "susceptible to elevated levels of anxiety and environmental stressors."  (<u>Id.</u>).  In addition, Dr. Singer's Report expressed concern over Hosay's reluctance to follow medication regimes and his belief "alternative remedies … were helpful, despite the fact that [Hosay's] psychotic symptoms and mood instability [had] periodically returned" and required psychiatric hospitalization.  (<u>Id.</u> at 18).

Dr. Guthrie's report noted Hosay had a history of violence during acute episodes, that his past aggression was "highly relevant to risk management," and that Hosay had experienced "both psychotic and mood components that [had] resulted in his repeated hospitalizations and acts of violence."  (Dr. Guthrie's Report at 10).  Dr. Guthrie also noted concern over Hosay's response to treatment because "he was noncompliant with recommended psychotropic medications in the community in between psychiatric hospitalizations" and his noncompliance "likely contributed to his repeated episodes of instability."  (<u>Id.</u>).

The circuit court's determination of facts was not unreasonable and, consistent with <u>Jones</u> and <u>Foucha</u>, the circuit court's commitment of Hosay was not an unreasonable application of federal law.  Claim 1 has no merit and will be dismissed.

*C.  Claim 2*

In his second claim, Hosay alleges that the dangerousness standard for civil commitment was based upon the release options as opposed to whether Hosay "had regained his sanity."

Hosay's reference to the transcript indicates he is reiterating his position that if he was not displaying active psychosis on the day of the hearing, even though he still suffered from the mental illness, the court needed to release him. (Id. at 93). The circuit court did not confuse the statutes and expressly declined to apply the civil commitment statute[8] in deciding whether Hosay would be released and applied the factors in the NGRI statute.[9] (Id. at 133, citing Va. Code § 19.2-182.3). The record conclusively demonstrates that the circuit court found by clear and

---

[8] The involuntary commitment statute provides, in pertinent part, that to involuntary commit a person a judge must find by clear and convincing evidence that

> the person has a *mental illness and there is a substantial likelihood that, as a result of mental illness, the person will, in the near future, (1) cause serious physical harm to himself* or others as evidenced by recent behavior causing, attempting, or threatening harm and other relevant information, if any, or (2) suffer serious harm due to his lack of capacity to protect himself from harm or to provide for his basic human needs, and (b) all available less restrictive treatment alternatives to involuntary inpatient treatment, pursuant to subsection D, that would offer an opportunity for the improvement of the person's condition have been investigated and determined to be inappropriate, the judge or special justice shall by written order and specific findings so certify and order that the person be admitted involuntarily to a facility for a period of treatment not to exceed 30 days from the date of the court order.

Va. Code § 37.2-817(C) (emphasis added). The emphasized portion of the civil commitment statute incorporates the elements of due process required by Foucha—mental illness and a danger to himself or others.

[9] Section 19.2-182.3 provides that the circuit court shall consider four factors in determining whether to commit an acquittee or release him or her from inpatient hospitalization:

> 1. To what extent the *acquittee has mental illness* or intellectual disability, as those terms are defined in § 37.2-100;
>
> 2. The *likelihood that the acquittee will engage in conduct presenting a substantial risk of bodily harm to other persons or to himself in the foreseeable future*;
>
> 3. The likelihood that the acquittee can be adequately controlled with supervision and treatment on an outpatient basis; and
>
> 4. Such other factors as the court deems relevant.

Va. Code Ann. § 19.2-182.3 (emphasis added). As with the civil commitment statute, see, supra note 8, the NGRI statute also incorporates the elements of due process required by Foucha—mental illness and a danger to himself or others.

convincing evidence that Hosay suffered from a mental illness and "that if released at this time there's a likelihood that he will engage in conduct which presents a substantial risk of bodily harm to himself or others." (Tr. at 135). To the extent Hosay argues that the trial judge erred in applying the other portions of the state statutes, such an alleged error is not cognizable in federal habeas. Estelle, 502 U.S. at 67-68 ("it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.").

Moreover, courts frequently consider the environment in which a petitioner will be treated as a factor in making decisions regarding the detainee's release or continued commitment. At the hearing, the trial judge heard evidence about Hosay's triggers, many of which were the stresses he would be subject to if he was released. (Tr. at 88). The trial judge also received evidence about not only Hosay's noncompliance (Id. at 54-56), but also his refusal to take medications that all of the experts had agreed he should be taking to help manage the risk of another psychotic episode. (Id. at 70, 86, 95). In his testimony, Dr. Gardella recommended that Hosay be returned to the jail on April 30, 2018 after the second TDO and explained that Hosay's returning to jail was the context with in which he made that recommendation because Hosay "was continuing to clear from his previous episode, and despite some residual symptoms at that time he did not meet the criteria for involuntary hospitalization." (Tr. at 79). He elaborated on the differences in the *environment* in which someone is to be released noting that there are individuals that would meet the criteria for civil commitment "where they could be returning to the community versus jail, and vice versa." (Tr. at 89). In short, even though Hosay had not yet fully recovered from his psychotic episode on April 30, 2018, *i.e.* he was "continuing to clear," the jail environment factored into his decision to release Hosay from hospitalization.

Dr. Gardella's point regarding the environment an acquittee would be released into as a factor considered in releasing an acquittee was addressed in United States v. Murdoch, 98 F.3d 472 (9th Cir. 1996). The Ninth Circuit held it was permissible to confine an insanity acquittee because of the individual's likely behavior upon leaving the confines of the mental institution where he was "insulated from the stress which triggered his acts of violence." Id. at 476. Murdoch recognized that simply because the petitioner was confined "in a controlled environment [and] … receiving treatment … [and] is not in a situation in which he will react dangerously does not mean that he no longer suffers from a mental disease which causes his dangerous propensities." Id. Similarly, the Fifth Circuit upheld the confinement of an insanity acquittee where the district court concluded that there was "no assurance in the record that he would continue to take his medication [that would lessen his symptoms] once released." United States v. Jackson, 19 F.3d 1003, 1007-08 (5th Cir.1994).

Hosay points to no controlling Supreme Court precedent that would prohibit a court from considering the characteristics of various environments and the likelihood of success by an acquittee in environments of varying degrees of confinement or release. Hosay likewise does not identify any controlling Supreme Court precedent that would preclude a court from considering an acquittee's noncompliance with treatment recommendations, which includes the acquittee's refusal to take prescribed medications. Consequently, Hosay has failed to establish that the trial court's decision was contrary to or an unreasonable application of federal law and claim 2 will be dismissed.

*D. Claim 3*

In claim 3, Hosay asserts he was prevented from presenting evidence at the hearing and that the evidence was insufficient for trial court to find that Hosay was both mentally ill and

17

dangerous. The evidence in support of Hosay's mental illness and his dangerousness was recounted above in discussing claim 1, see, supra at 10-14, and that evidence was more than sufficient to support the decision to commit Hosay to CSH. To the extent Hosay argues he was prohibited from presenting evidence, at best, he asserts an error of state law that is not cognizable in federal habeas. See Estelle, 502 U.S. at 67-68.[10]

In addition, Hosay mistakenly argues that the absence of active psychotic episodes means he does not have a mental illness. [Dkt. No. 13 at 2-3]. The fact that Hosay may have been asymptomatic at the hearing on April 19, 2019 did not preclude a finding of mental illness. See United States v. Weed, 389 F.3d 1060, 1073 (10th Cir. 2004) (upholding district court's finding that petitioner had a mental illness even though he "no longer shows symptoms of psychosis and meets no DSM-IV criteria for mental illness [because] the testifying doctors agree that [the petitioner] may still suffer from a condition not triggered since the time of the crime"); see also Murdoch, 98 F.3d at 476 (petitioner's "argument erroneously focuses on the symptoms or side-effects of his mental disease rather than on the existence of the disease itself."); see also Grass, 749 F.3d at 743 ("symptoms and mental illness are not one in the same") (citing Murdoch, 98 F.3d at 476). In determining whether to commit an individual for inpatient care, a trial judge is "entitled to consider the risk of dangerousness in light of [the patient's] entire behavioral and

---

[10] In addition, Hosay's response asserts that his current doctor has changed his diagnosis and that he is currently allowed to leave CSH on passes for 48 hours. [Dkt. No. 13 at 4-5]. While these facts may be relevant to his upcoming review in the circuit court on November 12, 2020, these facts were not before the circuit court on April 19, 2019 when it made its decision to commit Hosay to CSH. The matter before the Court is the decision the circuit court made on April 19, 2019. Indeed, the facts Hosay asserts did not exist at the time of the April 19, 2019 hearing. According to the exhibit attached to the response, the 48-hour passes began on July 8, 2020, which is more than a year after the circuit court made its decision. [Id. at 7]. To be sure, Hosay is apparently benefitting from the graduated transition component of the inpatient program that the circuit court noted would allow the professionals handling his care at CSH to assess how Hosay would handle the stress of additional liberty as his treatment progressed.

18

psychological profile, not just its most recent manifestation." United States v. Williams, 299 F.3d 673, 677 (8th Cir. 2002); see also United States v. Evanoff, 10 F.3d 559, 563 (8th Cir. 1993) (stating that "the recency or remoteness of any particular activity simply affects the weight the court will give to that particular evidence").

In the analogous context of a civil commitment under 18 U.S.C. § 4246, the Fourth Circuit affirmed the district court's commitment order based upon conflicting experts.  The district court received a report from the staff at FMC Butner that concluded the detainee suffered from "Delusional Disorder, Mixed Type," and if released the detainee posed "a substantial risk of bodily injury to another person or serious damage to the property of another." United States v. Stephenson, 509 Fed. Appx. 277, 278 (4th Cir. 2013).[11]  The forensic psychologist who diagnosed the detainee with Delusional Disorder, Mixed Type provided the basis for her opinion that the detainee posed "a 'moderate to high' risk for future violence." Id.  The detainee's expert, a forensic psychiatrist, testified that "although [the detainee] had several risk factors for future dangerousness, his social support in the community would adequately mitigate against these risk factors, such that his risk of dangerousness to others was low." Id.  The district court credited the government's witness and found that the detainee had a mental illness and posed a danger if release and committed him to inpatient care. Id.

The Fourth Circuit affirmed noting the psychologist's expert opinion on dangerousness was cogent, reasoned, and grounded in factors specific to detainee's risk of behaving violently in

---

[11]  The Fourth Circuit has explained the standard for review of a commitment order is that if "a district court determines a person is suffering from a mental disease or defect that would create a substantial risk of bodily injury to another person or serious damage to property of another, the court may commit the person to the custody of the Attorney General," and that it would "overturn a district court's finding that a substantial risk of harm exists only if the finding is clearly erroneous." United States v. Iaquinta, 132 Fed. Appx. 465, 466 (4th Cir. 2005) (citing United States v. Cox, 964 F.2d 1431, 1433 (4th Cir. 1992)).

future and was based on a review of a plethora of forensic, health, and legal records and multi-month course of observation, interviews, and testing. Id. Stephenson held that if the district court credited the government's expert's opinion over that given by the detainee's, that "alone was sufficient to establish Stephenson's dangerousness by clear and convincing evidence." Id. at 279. The decision in Stephenson was based upon a record that contained "no documented history that [the detainee] engaged in 'physically aggressive behavior' or 'acted out violently' on his delusional beliefs." Id. In affirming, Stephenson stated that the detainee's argument about the lack of a record containing a history of violent acts was "meritless" because "overt acts of violence are not required to prove substantial dangerousness in a § 4246(d) case." Id. (citing United States v. Williams, 299 F.3d 673, 677 (8th Cir. 2002)); see United States v. Sahhar, 917 F.2d 1197, 1207 (9th Cir. 1990) ("a finding of 'substantial risk' under section 4246 may be based on *any* activity that evinces a genuine possibility of future harm to persons or property.") (citing Jones, 463 U.S. at 364-65 (nonviolent crime against property sufficient to establish dangerousness)); United States v. Steil, 916 F.2d 485, 488 (8th Cir. 1990) (affirming district court's finding that a defendant was mentally ill "and, if released, would pose a substantial risk of bodily injury to, or serious damage to the property of, another" based upon the testimony of five mental health professionals that found him mentally ill and dangerous).

Here, Hosay's record has a history of documented violent acts and all of the experts agreed that Hosay needed inpatient care. Hosay has failed to establish that trial court's decision was a contrary to or an unreasonable interpretation of federal precedent. Claim 3 will be dismissed.

*E.  Claim 4*

      Hosay's last claim is simply another attempt to attack the sufficiency of the evidence supporting the circuit court's April 19, 2019 judgment.  The fact that Hosay had not had a psychotic episode in the approximately one year prior to the April 19, 2019 hearing is but one factor to consider and was not dispositive.  See, supra at 17-20.  To be sure, Hosay's argument ignores the testimony of the experts, the reports submitted, his admitted violent episodes, and his refusal to take medications that all of the doctors agreed would be beneficial to Hosay in preventing future psychotic episodes.  See Weed, 389 F.3d at 1073 (upholding district court's finding that petitioner had mental illness even though he "no longer shows symptoms of psychosis and meets no DSM-IV criteria for mental illness [because] the testifying doctors agree that [the petitioner] may still suffer from a condition not triggered since the time of the crime"); see also Murdoch, 98 F.3d at 476 (petitioner's "argument erroneously focuses on the symptoms or side-effects of his mental disease rather than on the existence of the disease itself.").  Hosay has not shown that the circuit court's decision that Hosay posed a substantial risk of bodily harm to himself or others was an unreasonable application of federal law.  Claim 4 will be dismissed.

****

      Hosay requested the Court appoint counsel to assist him in these proceedings alleging the proceedings are "complicated."  [Dkt. No. 12].  Hosay, however, has no right to counsel in seeking habeas corpus relief in the federal courts.  See McCleskey v. Zant, 499 U.S. 467, 495 (1991); Penn v. Finley, 481 U.S. 551, 555 (1987).  Although the Court has discretion to appoint counsel if it "determines that the interests of justice so require," 18 U.S.C. § 3006A(a)(2)(B), counsel should only be appointed under "exceptional circumstances."  Whisenant v. Yuam, 739 F.2d 160, 163 (4th Cir. 1984).  Hosay has presented no exceptional circumstances.  Further,

21

appointment of counsel is not required in a habeas corpus proceeding in the absence of an order

granting discovery or an evidentiary hearing. See Rules Governing Section 2254 Cases in the

U.S. District Courts, Rule 6(a), 8(c). The claims before the Court do not require discovery and

concern historical matters based upon the record and do not require a hearing. Cf. Bennett v.

Angelone, 92 F.3d 1336, 1347 (4th Cir. 1996) (denying petitioner's request for an evidentiary

hearing because he "add[ed] nothing 'additional" to the factual mix already before the district

court"). The motion for appointment of counsel will be denied.

### III. Conclusion

For the foregoing reasons, respondent's Motion to Dismiss [Dkt. No. 10] is granted, and

this petition must be dismissed with prejudice. An appropriate Order and judgment shall issue.[12]


Entered this __19th__ day of __October_____ 2020.

Alexandria, Virginia

_Claude M. Hilton_
USDJ

---

[12] An appeal may not be taken from the final order in a § 2254 proceeding unless a judge issues a certificate of appealability ("COA"). 28 U.S.C. § 2253(c)(1)(A). A COA will not issue unless a prisoner makes "a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). This requirement is satisfied only when "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" Slack v. McDaniel, 529 U.S. 473, 484 (2000) (quoting Barefoot v. Estelle, 463 U.S. 880, 893 n. 4 (1983)). Hosay fails to meet this standard.